# EXHIBIT B

**POMERANTZ LLP**
Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 432-8492

*Attorneys for Plaintiff*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON       12/14/2020
By_____/s/ Anthony Berini
               Deputy Clerk

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

SHARI ROSENMAN, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

FACEBOOK, INC., a Delaware corporation headquartered in California,

Defendant.

Case No.    20-CIV-05582

**CLASS ACTION COMPLAINT**

1. **VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*; and**,

2. **UNJUST ENRICHMENT**

Plaintiff Shari Rosenman ("Plaintiff"), individually and on behalf of all other members of the public similarly situated, brings this action against Defendant Facebook, Inc. ("Facebook"), upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record, and alleges as follows:[1]

**INTRODUCTION**

1.      This case arises out of Facebook's illegal practice of achieving industry dominance at the risk of consumer privacy.  When a company like Facebook does not face real competition and establishes a monopoly, it is free to harm consumer welfare.  As Facebook has grown through a series of major acquisitions of budding rivals like Instagram and WhatsApp, Facebook has inflicted a specific harm on consumers, namely, it has forced them to accept ever worse privacy settings.  Facebook preserves user privacy when it fears competition and degrades privacy when it does not.  Facebook has used its monopoly power to degrade the quality of service below what a competitive marketplace would allow.  Consumers suffer at the hand of a monopoly like Facebook because Facebook locks in users with promises to protect their data and privacy, only to break those promises once competitors in the marketplace have been eliminated.  This action seeks to remedy Facebook's wrongful conduct.

**JURISDICTION AND VENUE**

2.      This class action is brought pursuant to California Code of Civil Procedure section 382. The monetary penalties and restitution sought by Plaintiff exceed the minimal jurisdictional limits of the Superior Court and will be established according to proof at trial. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, section 10. The statutes under which this action is brought do not specify any other basis for jurisdiction.  Plaintiff's share of civil penalties sought in this action does not exceed $75,000.

3.      This Court has jurisdiction over Facebook because Facebook is a citizen of the State of California, with its national headquarters at 1601 Willow Road, Menlo Park, California, and because Facebook has sufficient minimum contacts in the State of California.  Furthermore, Facebook has intentionally availed itself of the California market so as to render the exercise of

---

[1] All emphasis in text and images is added unless otherwise noted.

CLASS ACTION COMPLAINT

jurisdiction over Facebook by the California courts consistent with traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court because Facebook conducts business within the State of California, a substantial portion of the transactions and occurrences that form the basis of Plaintiff's action occurred in this County, and Facebook's Terms of Service[2] require that any claim, cause of action, or dispute against Facebook that arises out of or relates to its products or services be resolved exclusively in San Mateo County.

## PARTIES

5.      Plaintiff Shari Rosenman ("Plaintiff") is, and at all times relevant hereto has been, a resident and citizen of the State of California.

6.      Plaintiff maintains an active Facebook account and uses Facebook. Plaintiff also uses WhatsApp.

7.      Plaintiff cares about her online privacy and trusted Facebook to protect her privacy. But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, she does not trust Facebook to protect her online privacy. Plaintiff dislikes the invasiveness of Facebook and its products. Despite this, Plaintiff continues to use Facebook and Whats App products because people she knows use them, and there are no other suitable alternatives to connect with her friends and family.

8.      If Plaintiff had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook access to as much personal data about herself.

9.      Facebook is a Delaware corporation with its principal place of business located within this District at 1 Hacker Way, Menlo Park, California 94025.  Facebook's common stock trades on the New York Stock Exchange under the ticker symbol "FB."  Facebook's market capitalization as of June 10, 2020, was approximately $680 billion.

10.     Facebook owns and operates several business divisions, such as:

_____

[2] Facebook's Terms of Service, https://www.facebook.com/terms.php, last accessed December 14, 2020.

- ▪ <u>Facebook</u>: Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

- ▪ <u>Instagram</u>: Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

- ▪ <u>Messenger</u>: Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- ▪ <u>WhatsApp</u>: WhatsApp is a secure messaging application used by individuals and businesses. Facebook acquired WhatsApp in 2014.

11.     The true names and capacities of Defendants sued in this Complaint as Does 1 through 10, inclusive, are currently unknown to Plaintiff, and therefore Plaintiff sues such Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 10 were the partners, agents, owners, shareholders, managers, or employees of Facebook at all relevant times.

12.     Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants was in some manner legally responsible for the actionable and unlawful actions, policies and practices as alleged herein.  Plaintiff will amend this Complaint to set forth the true names and capacities of said Defendants, along with the appropriate charging allegations, when the same have been ascertained.  Reference in this Complaint to "Facebook" or "Defendant" is also a reference to all Defendants sued as Does 1 through 10.

13.     Plaintiff reserves the right to expand, limit, modify, or amend these allegations at any time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

### Facebook's Lack of Competition

14.     There can be little dispute that Facebook faces a lack of competition. The company is by far the biggest social network in the United States and successfully further staved off future competition by acquiring Instagram in 2012 for $1 billion and WhatsApp in 2014 for $19 billion. Facebook itself boasted in 2011 that "Facebook is now 95% of all social media."  In recent dialogue between Lindsey Graham (R-SC) and Facebook founder and chief executive officer Mark Zuckerberg, Graham pressed Zuckerberg to identity competitors in the private market.  Similarly, House judiciary committee chairman Bob Goodlatte (R-Va.) raised questions regarding the lack of competition Facebook faces.  *Hearing on Facebook Congressional Hearing Before the Committee on Energy and Commerce*, 115th Cong. (April 2018).

15.     Facebook is the reigning platform, not only in the lives of Americans, but in the lives of 2.2 billion people worldwide.  Facebook is the world's largest social media company, and it provides users with an online platform to stay connected with family and friends through the sharing of photos, videos, and other content.

16.     Though the social network market was highly competitive in the beginning, the market has since consolidated in Facebook's favor. Consumers effectively face a singular choice—use Facebook and submit to the quality and stipulations of Facebook's product or forgo all use of the only social network used by most of their friends, family, and acquaintances. Ninety-Nine percent of adults in the U.S. that use social media use Facebook.

17.     The reason for this is that Facebook is a "closed" communications network and users must join simply to access the network. Not all social networks are closed— LinkedIn, for example, disseminates user communications across its own network and also Twitter. But, Facebook, with a hold on the market and greatest number of users, declines the path of interconnection, or inter-operability. Consumers cannot forgo Facebook, in much the same way an earlier generation was beholden in the early 20th century to another communications behemoth, AT&T— another company that leveraged a closed-network approach to protect

1   market share and foreclose competition in the telephone network market.  However, even if one

2   does include other social networks as part of a relevant market, Facebook still dominates with

3   over 80% of total consumer time spent across various social networks.

4        18.    Facebook illegally maintains its monopoly power by deploying a buy-or-bury

5   strategy that thwarts competition and harms both users and advertisers.  As Facebook's founder

6   and CEO, Mark Zuckerberg observed, "[o]ne thing about startups . . . is you can often acquire

7   them," indicating at other times that such acquisitions would enable Facebook to "build a

8   competitive moat" or "neutralize a competitor."

9        19.    Zuckerberg recognized early that even when these companies were not inclined

10  to sell, if Facebook offered a "high enough price . . . they'd have to consider it." Facebook has

11  coupled its acquisition strategy with exclusionary tactics that snuffed out competitive threats

12  and sent the message to technology firms that, in the words of one participant, if you stepped

13  into Facebook's turf or resisted pressure to sell, Zuckerberg would go into "destroy mode"

14  subjecting your business to the "wrath of Mark." As a result, Facebook has chilled innovation,

15  deterred investment, and forestalled competition in the markets in which it operates, and it

16  continues to do so.

17       20.    Facebook's unlawfully maintained monopoly power gives it wide latitude to set

18  the terms for how its users' private information is collected, used, and protected and the privacy

19  protections afforded to its users. Content shared by users is displayed to other users. Facebook's

20  monopoly gives it significant control over how users engage with their closest connections and

21  what content users see when they do. Because Facebook users have nowhere else to go for this

22  important service, the company is able to make decisions about how and whether to display

23  content on the platform and can use the personal information it collects from users solely to

24  further its business interests, free from competitive constraints, even where those choices

25  conflict with the interests and privacy considerations of Facebook users.

26      **Facebook Reneged on Its Privacy Commitments to Consumers**

27       21.    Facebook began its existence in 2004 by differentiating itself on privacy.

28  Unlike then-dominant MySpace, for example, where profiles were visible to anyone by

default, Facebook profiles could be seen only by your friends or people at the same school, verified by an .edu email address. "We do not and will not use cookies to collect private information from any user," vowed an early privacy policy.  As Facebook built up its dominant position, it began offering users worse and worse privacy experience.  Facebook leveraged its market power in a consolidated market to successfully degrade privacy to levels unsustainable in the earlier competitive market when market participants were subject to consumer privacy demands. Facebook rapidly unraveled its promise not to conduct commercial surveillance by using the technical framework it built over the years by perpetuating the belief that it would not leverage such a framework for a commercial purpose.

22.     As the company grew, Facebook tried to backslide on its privacy commitments, but it faced discipline from a market that it still had not cornered. With the threat of losing its customers to competitors, Facebook was forced to reverse course.  For example, in 2007, it rolled out Beacon, a product that allowed it to track user activity even when they were off the site. Facing fierce backlash—Beacon publicly reported consumers' purchase habits on friends' NewsFeeds—the company discontinued Beacon within the year. Zuckerberg called it a "mistake."

23.     For many years, Facebook perpetuated the belief it would not leverage backdoor access, the way it had with Beacon, to conduct surveillance for commercial purposes. Consumers had shown an aversion to the idea of Facebook tracking them while not on Facebook. The steady stream of public claims that Facebook did not and would not use the network of code for social plugins to monitor and track consumer behavior prompted consumers to continue to trust and therefore choose Facebook over alternatives in the market.

24.     After rivals like MySpace exited the stage, however, Facebook had less to fear. Today, its "pixel" tracks users all around the internet, just as Beacon did (but without the ill-considered NewsFeed posts). This is just one of many ways in which Facebook rolled back privacy protections once it sensed that users couldn't take their business elsewhere.

25.     Facebook spent the next fifteen years deceiving consumers about the lackluster data privacy protections that it provided to users in exchange for their data. When the scope of

commercial surveillance, and the harvesting and use of user data that Facebook's data-brokering practices enabled was first revealed in 2018 following news coverage about the Cambridge Analytica scandal, Facebook had already achieved a monopoly in the United States.

26.     Beginning in 2007, Facebook gave app developers access to user content and information, encouraging them to build apps to stimulate user engagement. Facebook paid these app developers not with cash, but with user content and data, including content marked private. As Facebook attempted to become the world's dominant social media service, it struck agreements allowing phone and other device makers access to vast amounts of its users' personal information.

27.     Facebook did not disclose to its users the scope of the content and data that Facebook began providing to third parties at that early date, including user data marked "private."

28.     In short, Facebook entered a competitive social media market and disintermediated competition by offering superior consumer privacy protections. Subsequently, Facebook tried to undermine privacy to initiate consumer surveillance for the purpose of delivering more targeted advertising, but the competitive market would not allow it. Only after other social networks like MySpace exited the market, and Facebook amassed over a billion users, was Facebook able to reverse course, and initiate consumer surveillance. The fact-pattern demonstrates an inelasticity of demand for Facebook's product, and in turn, constitutes a direct showing of monopoly power and diminished quality for consumers.

29.     As Facebook's market share grew and it vanquished competition through acquisitions and appropriation, Facebook rescinded users' veto power.  Facebook revoked its users' ability to vote on changes to its privacy policies and then (almost simultaneously with Google's exit from the social media market) changed its privacy pact with users.  In 2014, Facebook formally announced that it would track users via the login and Like buttons embedded in millions of news sites, online retailers and games.

30.     Despite pubic statements to the contrary, Facebook used the Like button code now installed on third-party sites to write and read user cookies.  Each time a Facebook user visited a site with a Like button, Facebook retrieved the user's Facebook website login cookies, which contained the user's unique identifying number, traceable to his or her real identity. Facebook again was leveraging login cookies from the communications network to conduct detailed surveillance possibly for the advertising side of its business. In addition to a user's ID number, Facebook retrieved the specific URL the user was on, which revealed the title of an article the user was reading or the name of the product a user was buying.

31.     A recent lawsuit by States' Attorneys' General based on Facebook internal reports confirms that Facebook, in fact, competed for users by offering better privacy protections and that Facebook reneged on those commitments later, when Facebook thought it could get away with it

32.     For example, in an internal Facebook report from 2008, Facebook identifies strong privacy controls as one of four pillars of "Facebook Secret Sauce." The report observed, "Users will share more information if given more control over who they are sharing with and how they share."

33.     A revealing insight comes from the summer of 2011, when the company was gearing up to fend off the threat of Google's rival platform, Google+. The Attorneys' General complaint quotes an email in which Facebook COO Sheryl Sandberg wrote, "For the first time, we have real competition and consumers have real choice … we will have to be better to win." At the time, Facebook had been planning to remove users' ability to untag themselves in photos. One unnamed executive suggested pumping the brakes. "If ever there was a time to AVOID controversy, it would be when the world is comparing our offerings to G+," they wrote. Better, they suggested, to save such changes "until the direct competitive comparisons begin to die down." This is close to a smoking gun: evidence that Facebook preserves user privacy when it fears competition and degrades privacy when it does not.

34.     Facebook over time became more aggressive about both collecting data on its users' off-platform activity and pushing users to make more information public. Facebook

repeatedly made great efforts to present its privacy changes as giving users greater control, even as Facebook made more privacy settings public and thus less protective by default, took away options to limit visibility, and changed its privacy policy to allow for more collection and use of user data.

35.     Indeed, even if you choose to leave Facebook, the company still subjects you to surveillance, but you no longer have access to the privacy settings. Staying on the platform is the only way to try to manage its harms.

36.     As Facebook grew more dominant, Facebook backslid on privacy commitments.  That conduct was not coincidental. Facebook has used its monopoly power to degrade the quality of service below what a competitive marketplace would allow.  Consumers suffer at the hands of monopolies like Facebook because Facebook locks in users with promises to protect their data and privacy, only to break those promises once competitors in the marketplace have been eliminated.

37.     Facebook is "free" to use.  However, users exchange their time, attention, and personal data for access to Facebook's services. Instead of charging users a fee to use its service, Facebook sells advertising to marketers. In the digital advertising market, the ability to conduct unprecedented commercial surveillance is a bedrock of Facebook's current source of revenues and profits. Facebook generates nearly all of its revenues from the sale of advertising, and the prices of ads sold today directly correlate with data derived from tracking consumers.

38.     Rather than raising prices like a traditional monopolist, Facebook harmed consumers by charging them the use of ever-increasing amounts of their personal data to use its platform.  Consumer harm can exist through the use of personal data, even if the service is free.

39.     Facebook's destruction of competition has caused consumers to suffer and to continue to suffer substantial economic injury through the degradation of their privacy. Consumers give up something of material value when agreeing to Facebook's Terms of Service: personal information and privacy. That information and attention is then sold in measurable units to advertisers in exchange for substantial amounts of money. Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service.

CLASS ACTION COMPLAINT

40.     Facebook's conduct also deprives users of product improvements and, as a result, users have suffered, and continue to suffer, reductions in the quality and variety of privacy options and content available to them.

41.     Facebook's conduct alleged herein has inflicted harm and injury.  Facebook has built up a monopoly, and that monopoly has been harmful.  Specifically, it has forced consumers to accept ever worse privacy settings and degraded privacy protections.  Facebook rolled back privacy protections once it sensed that users could not take their business elsewhere.

42.     Facebook may not charge users a fee, but that does not mean that users haven't been paying a price.

43.     By this action, Plaintiff seeks recovery for consumers' losses and Facebook's unlawful gains, and other appropriate equitable relief to prevent Facebook from continuing to destroy competition and harm consumers.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff re-alleges and incorporates by reference each allegation set forth above.

45.     Plaintiff brings this action on her own behalf, as well as on behalf all other persons similarly situated, and thus seeks class certification under California Code of Civil Procedure section 382.

46.     All claims alleged herein arise under California law for which Plaintiff seeks relief authorized by California law.

47.     Plaintiff's proposed Class consists of and is defined as follows:

> All persons or entities who maintained a Facebook profile at any time within four years of the date of the filing of this action. Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff (the "Class").

48.     Members of the Class are referred to herein as "Class members."

49.     Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

50.     There are common questions of law and fact as to Class members that predominate over questions affecting only individual members, including, but not limited to:

(a)     Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

(b)     Whether Facebook's acquisition conduct was anticompetitive;

(c)     Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

(d)     Whether Facebook intentionally made material misrepresentations or omissions about its data privacy practices and the extent of its commercial surveillance;

(e)     Whether Facebook's foreclosure of competition caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

(f)     Whether consumers would have had more options and competition amongst social media companies if Facebook would have revealed the full extent of its data privacy practices and commercial surveillance long ago;

(g)     Whether Facebook's anticompetitive conduct should be enjoined or whether other equitable relief is appropriate; and,

(h)     The appropriate amount of restitution or monetary penalties resulting from Facebook's violations of California law.

51.     There is a well-defined community of interest in the litigation and the Class members are readily ascertainable:

(a)     <u>Numerosity</u>:  The Class members are so numerous that joinder of all Class members would be unfeasible and impractical.  The membership of the entire Class is unknown to Plaintiff at this time; however, the Class is estimated to be greater than one hundred (100) individuals and the identity of such membership is readily ascertainable by inspection of Defendant's records.

(b)    <u>Typicality</u>:  Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class member with whom she has a well-defined community of interest, and Plaintiff's claims (or defenses, if any) are typical of all Class members as demonstrated herein.

(c)    <u>Adequacy</u>:  Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class member with whom he has a well-defined community of interest and typicality of claims, as demonstrated herein.  Plaintiff acknowledges that she has an obligation to make known to the Court any relationship, conflicts or differences with any Class member.  Plaintiff's attorneys, the proposed Class counsel, are versed in the rules governing class action discovery, certification, and settlement.  Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be necessarily expended for the prosecution of this action for the substantial benefit of each Class member.

(d)    <u>Superiority</u>:  The nature of this action makes the use of class action adjudication superior to other methods.  A class action will achieve economies of time, effort, and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire class.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

52.    The existence of the anticompetitive acts alleged herein could not be discovered until, at the earliest, March 17, 2018. As the House Antitrust Subcommittee recently explained, "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of scandals involving large-scale data breaches or privacy incidents such as Cambridge Analytica."[3] It was not until the media uncovered the details of the Cambridge Analytica

---

[3] See Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, at 54, October 6, 2020, available at https://kl.link/3jGISfK.

scandal on March 17, 2018, that consumers began to discover Facebook's anticompetitive practices that harmed consumers and that would have enabled consumers to raise the claims presented in this action. Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22, 2018, that consumers learned of the additional facts regarding Facebook's anticompetitive practices necessary for consumers to raise the claims presented in the action.

53.     Nor could Plaintiff have discovered, through the exercise of reasonable diligence, the existence of the anticompetitive acts alleged herein until, at the earliest, March 2018. The subsequent investigative reporting that brought to light Facebook's systematic deception and commercial surveillance was not made public until, at the earliest, March 17, 2018, following the Cambridge Analytica scandal. Consequently, Plaintiff and Class members did not discover, nor could they have discovered through reasonable diligence, that Facebook was violating the antitrust and other laws until less than four years before this litigation was initially commenced. Accordingly, the statute of limitations should be equitably tolled to March 2018. As such, all of the anticompetitive conduct described in this complaint presents timely claims, including Facebook's deception and acquisition conduct going back to before it achieved its social media monopoly.

54.     In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiff and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

55.     Furthermore, the harm to Plaintiff and Class members was not sufficiently ascertainable to give rise to the claims presented herein more than four years prior to the filing of this action. Since the harm that Plaintiff and Class members allege had not become known more than four years prior to the date that this action was initiated, the unfair competition claims presented herein are timely.

56.     Any applicable statute of limitation is tolled by Facebook's knowledge, active concealment, and wrongful conduct set forth herein.  Facebook is further estopped from relying on any statute of limitation because of its concealment set forth herein.

**FIRST CAUSE OF ACTION**

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

57.     Plaintiff re-alleges and incorporates by reference each allegation set forth above.

58.     California Business and Professions Code section 17200, *et seq*. (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."  Facebook has committed acts of unfair competition proscribed by the UCL, including the acts and practices alleged herein.

59.     The UCL imposes strict liability.  Plaintiff need not prove that Facebook intentionally or negligently engaged in unlawful or unfair business practices – only that such practices occurred.

60.     Facebook is a "person" as defined by Business & Professions Code § 17201.

61.     As a direct and proximate result of Facebook's acts and practices in violation of the UCL, Plaintiff and members of the Class have suffered injury in fact and lost money or property as set forth above and will continue to do so.

**Unfair Prong**

62.     An act or act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided.  An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.   Facebook's conduct violates all of these definitions.

63.     As alleged above, Facebook engages and has engaged in a systematic business practice of leveraging its market power in a consolidated market to successfully degrade privacy

1    to levels unsustainable in the earlier competitive market when market participants were subject

2    to consumer privacy demands.

3          64.    Facebook's destruction of competition has caused consumers to suffer and to

4    continue to suffer substantial economic injury through the degradation of their privacy.

5    Consumers give up something of material value when agreeing to Facebook's Terms of Service:

6    personal information and privacy. That information and attention is then sold by Facebook in

7    measurable units to advertisers in exchange for substantial amounts of money. Consumers thus

8    give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service.

9          65.    Facebook's conduct also deprives users of product improvements and, as a result,

10   users have suffered, and continue to suffer, reductions in the quality and variety of privacy

11   options and content available to them.

12         66.    Facebook's conduct alleged herein has inflicted harm and injury. Facebook has

13   built up a monopoly, and that monopoly has been harmful.  Specifically, it has forced

14   consumers to accept ever worse privacy settings and degraded privacy protections.

15         67.    Rather than raising prices like a traditional monopolist, Facebook harmed

16   consumers by charging them the use of ever-increasing amounts of their personal data to use its

17   platform.  Consumer harm can exist through the use of personal data, even if the service is free.

18         68.    All of the acts and practices of Facebook as described in this complaint constitute

19   "unfair" business acts and practices. A business act or practice is "unfair" under the UCL if the

20   reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of

21   the harm to the alleged victims.  Plaintiff has suffered injury in fact and a loss of money or

22   property as a result of Facebook's unfair business acts and practices as set forth herein in detail.

23   It is Plaintiff's information and belief that Class members have also suffered injury as a result of

24   Facebook's wrongful conduct.

25         69.    As a direct and proximate result of Facebook's acts and practices in violation of

26   the UCL, Plaintiff and members of the Class have suffered and continue to suffer substantial

27   economic injury through the degradation of their privacy. Forcing consumers to accept ever

28   worse privacy settings and degraded privacy protections is clearly unfair.

CLASS ACTION COMPLAINT

70.     Facebook's conduct does not benefit consumers or competition. Plaintiff and Class members could not reasonably have avoided the injury each of them suffered or will suffer, which injury is substantial. Facebook's conduct only benefits Facebook, by enabling Facebook to capitalize on its dominant market power at the expense of diminished quality and privacy protections for consumers. Plaintiff will continue to suffer injury to her privacy if Facebook's conduct as alleged herein is not enjoined.

71.     The gravity of the consequences of Facebook's conduct as described above outweighs the justification, motive or reason therefor, is immoral, unethical and unscrupulous, and offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to the public, for the reasons set forth above.

72.     Facebook's conduct also offends established public policy, or is substantially injurious to the public, for the reasons set forth above.

73.     To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to Facebook's justification and motives for its conduct, and as to the impact of Facebook's conduct on Plaintiff and Class members.

74.     Facebook's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. § 1021.5.

### **Deceptive Prong**

75.     Facebook mislead consumers about its data privacy practices and the scope of the data it collected and made available to third parties.

76.     Said conduct is likely to deceive an ordinary consumer because Facebook concealed its privacy practices from consumers.

77.     Plaintiff justifiably relied on the information that Facebook disseminated about its privacy protections.

78.     The facts concealed and not disclosed by Facebook and concealed from Plaintiff and members of the Class are material.  Had Plaintiff and members of the Class known the truth about Facebook's privacy practices years ago, they would not have agreed to give Facebook access to as much personal data about themselves.

79.     Facebook continues to conceal the truth about is privacy protections in order to minimize the amount of money that Facebook makes on ad revenue.

**SECOND CAUSE OF ACTION**

**Unjust Enrichment**

80.     Plaintiff re-alleges and incorporates by reference each allegation set forth above.

81.     Plaintiff and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

82.     These benefits are quantifiable in measurable units. Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

83.     Those benefits received by Facebook were at the expense of Plaintiff and Class members.

84.     Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members. For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiff and Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you." Facebook has similarly recognized that Plaintiff and Class members have conferred on it the benefits of their time and attention, as evident from the fact that Facebook internally tracks the time its users spend on Facebook (and its family of products) and compares these figures to the time they spend on other competing services.

85.     Facebook acquired these benefits from Plaintiff and Class members through misrepresentations and deception. Facebook induced Plaintiff and Class members to join

CLASS ACTION COMPLAINT

Facebook based on the promise of stringent privacy protections. Meanwhile, Facebook concealed the scope of the data it harvested from Plaintiff and Class members and brokered to third parties. Facebook failed to reveal the manner in which it weaponized Plaintiff's and Class members' data to "copy, kill, or acquire" Facebook's rivals.

86.     As a result of Facebook's receipt of the direct benefits of Plaintiff's and Class members' data, time, and attention, Facebook was able to destroy competition, enriching itself at the expense of Plaintiff and Class members. Although Plaintiff and Class member conferred on Facebook the direct benefits of their data, time, and attention, Plaintiff and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; and (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

87.     Facebook has unjustly reaped significant financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. The circumstances alleged herein are such that it would be unjust for Defendant to retain the portion (if not the entirety) of Plaintiff's and Class members' payments, or the value of other consideration, that should have been earmarked to provide higher quality social networking services, and adequate privacy protections for Plaintiff's and the Class' private information, including only surveillance and third-party sharing as authorized by its customers.

88.     Plaintiff seeks an order directing Facebook to disgorge these benefits and profits and pay restitution to Plaintiff and other Class members.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, seeks the following relief:

a)     For an order certifying this case as a class action, appointing Plaintiff as the representative of the Class, and appointing counsel for Plaintiff as Class Counsel;

b)     That the Court declare, adjudge and decree that that Facebook is financially

1   responsible for notifying all Class members about the wrongful conduct set forth herein;

2          c)      That the Court declare, adjudge and decree that that Facebook's conduct as

3   alleged herein violates the laws alleged herein;

4          d)       Injunctive and other equitable relief as is necessary to protect the interests of

5   Plaintiff and Class members, including: (i) an order prohibiting Facebook from continuing to

6   engage in the wrongful acts described herein; (ii) requiring Facebook to engage third-party

7   auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial

8   surveillance, and acquisition conduct, and ordering them to promptly correct any problems or

9   issues detected by these auditors, and, (iii) modifying certain business practices, including how

10  Facebook tracks users when they are off the company's platforms;

11         e)      For an award to Plaintiff and Class members of restitution and/or disgorgement

12  of all amounts wrongfully charged to and received from Plaintiff and Class members;

13         f)      For the appointment of a receiver as necessary to receive, manage and distribute

14  any and all funds disgorged from Facebook and determined to have been wrongfully acquired

15  by Facebook as a result of violations of California Business & Professions Code section 17200,

16  *et seq.*;

17         g)      For an award of statutory damages including reasonable attorneys' fees and costs

18  of suit pursuant to California Code of Civil Procedure § 1021.5, and any other applicable law;

19         h)      For statutory damages including reasonable attorneys' fees, costs of suit and

20  treble damages if Facebook's conduct was done knowingly;

21         i)      For an award of pre-judgment and post-judgment interest at the legal rate;

22         j)      For leave to amend the Complaint to conform to the evidence produced at trial;

23  and,

24  ///

25  ///

26  ///

27  ///

28  ///

CLASS ACTION COMPLAINT

1        k)       For all other relief as may be appropriate under the circumstances.

2

3   Dated: December 14, 2020          Respectfully submitted,

4                               **POMERANTZ LLP**

5

6                        By: _____

7                           Jordan L. Lurie
                               Ari Y. Basser

8                         *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT